# AFFIDAVIT

1.  I am a Special Agent with the United States Federal Bureau of Investigation, and have been employed in this position for twenty-one and one half years. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18 United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1). I am currently assigned to the Plattsburgh, New York office. My duties include the investigation of federal crimes involving telemarketing fraud and bank fraud.

2.  I am familiar with the information contained in this affidavit through my personal investigation, my review of materials included in the investigation file, and as a result of conversations with others, including United States Customs and Immigration Enforcement (ICE) Special Agent Joseph Dubreville, who is stationed in the Williamsville, New York office. Where conversations or statements of others are related herein, they are related in part and in substance. Moreover, because this affidavit is submitted for a limited purpose, I have not set forth every fact that I have learned during the course of this investigation.

3.  I make this affidavit in support of a complaint charging JOEL BORDEN with knowingly devising and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, transmitting and causing to be transmitted in interstate commerce wires, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code Section 1343.

4.  The ICE Offices in Buffalo, New York and Boston, Massachusetts have been engaged in ongoing international telemarketing fraud investigations that have involved numerous Canadian citizens and residents, who have been both opening and using U.S. bank accounts and/or U.S. third party payment merchant accounts in order to process fraudulent telemarketing sale transactions. Both ICE investigations have identified JOEL BORDEN as an owner/and or main contact person for several of these companies, to wit; MEDTEC a.k.a. 3747051 CANADA INC; PREMIUM BENEFITS a.k.a. 374051 CANADA, and BORDEN NATIONAL MERCHANT SERVICES.

5.  According to U.S. ICE Special Agent Joseph Dubreville, the Buffalo investigation determined that, in or about March 2005, JOEL BORDEN opened and/or caused to be opened two merchant processing accounts with "Intercheck Technologies (ICT)," a U.S. third party payment merchant company that was based in Columbus, Ohio. One account was opened under the name of

MED TEC, which claimed to be selling medical discount cards, and the other was opened under the name of PREMIUM BENEFITS, which claimed to be selling an ID theft protection program.

6. From in or about March 2005, until approximately February 2006, ICT processed 6,247 deposit transactions in the form of bank drafts for MED TEC. All of the deposits were for $399 each, and of the total transactions, 5,016 or 80% were returned, either for insufficient funds, because the account had been closed, or because the transfer had not been authorized. From the remaining 1231 transactions, however, MED TEC realized approximately $491,000.

7. During this same time period, ICT processed 10,008 deposit transactions for PREMIUM BENEFITS, also in the form of bank drafts. Of these deposits, 7,658 or 76% of the transfers were returned. As a result of the remaining 2350 transactions, PREMIUM BENEFITS realized approximately $151,000, most of which was transferred by wire from Ohio to a Citizens Bank account in Albany, New York, in the name of BORDEN NATIONAL MERCHANT SERVICES.

8. ICE Special Agent Dubreville has stated that his investigation has identified numerous fraudulent telemarketing companies based in Canada and the U.S. that are involved in selling what are termed "full data lead lists" to each other. These lists contain a person's name, address, bank, bank routing number, and bank account number. With this information, a fraudulent telemarketing company can produce a preauthorized draft check that does not require the account holder's signature, which is then deposited into the telemarketing company's bank account. Alternatively, the information can be provided to a third party payment processor (such as ICT), which then drafts the preauthorized draft check for the fraudulent company, deposits the check into the company's account with them, and ultimately wire transfers the funds (less their "fees") to the fraudulent company or merchant after the transaction is complete. The process by which a list is run through a financial institution without contacting the alleged customer is termed in the telemarketing industry "slamming the list."

9. Based on the ICE investigation in Buffalo, it appears that MED TEC and PREMIUM BENEFITS were both engaged in this type of fraud. In addition to the companies' involvement with ICT, both companies exhibited activity that is generally seen in companies that are using "full data lead lists," and "slamming the lists." Because these lists are generally sold several times over, they are often used by more than one fraudulent company at a time. As a result, after a while, the account owners (or their guardians) become aware of the scamming activity and shut down or arrange to have the accounts shut down. This explains why a large number of the deposit transactions arranged for by the fraudulent companies end up being returned (as occurred with MED TEC and PREMIUM BENEFITS) and it also explains why many fraudulent companies end up scamming the same victims.

10. According to U.S. ICE Special Agent Kyle Burns, JOEL BORDEN is also the owner of a company, BORDEN NATIONAL MERCHANT SERVICES, that is involved in the ICE investigation in Boston. Special Agent Burns has indicated to Special Agent Dubreville that a bank account holder and victim has stated that, between August and December 2005, her account was

debited ten times by companies in transactions that she never authorized. BORDEN NATIONAL MERCHANT SERVICES was one of these companies.

11. On September 27, 2007, Chris Wiegand of HSBC Bank in Plattsburgh, New York contacted the FBI office in Plattsburgh and informed me that, on September 26, 2007, the bank had frozen for suspicious activity a bank account containing approximately $80,000. The account named JOEL BORDEN and a company called NATIONAL FULFILLMENT as its holders. The account, which had been opened in or about January 2007, had been dormant for several months, until approximately June 2007, when it began receiving voluminous deposits from banks throughout the United States, including California, Mississippi, and Maryland, most of which were for $400 (although some were apparently for $389), resulting in numerous interstate wire communications of funds. In or about September 2007, large numbers of these transactions began to be returned, generally for insufficient funds, because the account had been closed, or because the checks were found to be counterfeit. Mr. Wiegand has further stated that, when JOEL BORDEN telephoned from Canada to inquire about the account closure, BORDEN explained that NATIONAL FULFILLMENT was engaged in selling healthcare discount cards, that it used a company in South Carolina to do "phone bursts" (that is, to make phone calls with recorded sales messages), which were then routed, if the customer was interested, to India, where sales representatives took their order information; and that the company also used a website to recruit customers. At Mr. Wiegand's request, BORDEN agreed to come to Plattsburgh to attempt to resolve the situation.

12. Mr. Wiegand indicated that, in or about September 2007, approximately 200 of these deposits were returned, in a total amount of approximately $75,000. Mr. Wiegand stated that he had contacted approximately half a dozen of the corresponding banks, and inquired about some of the returned deposits. In each instance, Mr. Wiegand was informed that the account holder was either elderly or infirm or both (in fact, none of the six individuals was under the age of 87) and it appears would, therefore, have been unlikely to have authorized the transaction.

13. On October 3, 2007, JOEL BORDEN arrived at the HSBC office in Plattsburgh, where I interviewed him, in the presence of Mr. Wiegand. BORDEN repeated the claim he had previously provided to Mr. Wiegand concerning the "phone bursts" and the website. He further stated that his company sold healthcare discount cards, called Pinnacle Choice, which he claimed to have purchased himself at a discount from Pinnacle Choice. Although Pinnacle Choice appears to be a legitimate company, BORDEN eventually admitted that he had no arrangement with Pinnacle Choice, but claimed that he had been talking to "a gentleman named ━━━" about creating such an arrangement. BORDEN admitted that, as of this date, however, none of the people who purportedly had paid him had received anything for their money.

14. Based on the foregoing facts, I believe there is probable cause to indicate that JOEL BORDEN knowingly and willfully devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, transmitted and caused to be

transmitted in interstate commerce wires, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code Section 1343, and to arrest him for this offense.

Stephan F. Weishaupt
Special Agent
Federal Bureau of Investigation

Subscribed and Sworn to before me this 3rd day of October 2007

Larry

LAWRENCE A. KUDRLE
UNITED STATES MAGISTRATE JUDGE