IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

    v.

Joel Borden,

        Defendant.

Criminal Action No.
08-CR-196 (LEK)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SENTENCING MEMORANDUM OF THE UNITED STATES**

**I.**     **INTRODUCTION**

On April 24, 2008, pursuant to an Agreement between the parties, the Defendant waived indictment and pled guilty to a one-count Information charging him with wire fraud in connection with the conduct of telemarketing that targeted and victimized ten or more persons over the age of 55, in violation of 18 U.S.C. §§ 1343, 2326, and 2. The United States submits this Memorandum in anticipation of sentencing, now scheduled for December 3, 2009, moves for a downward departure under U.S.S.G. § 5K1.1 based upon substantial assistance provided by the Defendant, and recommends a sentence of imprisonment within a Guideline imprisonment range of 63 - 78 months, to be followed by supervised release for 5 years, plus restitution and the $100 special assessment. If the restitution amount does not account for all the proceeds of the crime, the United States recommends a fine.

## II.  SUMMARY OF THE FACTS

The Defendant was the owner of companies known as Borden National Merchant Services and National Fulfillment Center, as well as 3747051 Canada, Inc., and a point of contact with a payment processing company for companies known as Med Tech and Premium Benefits, and he utilized these companies to participate in a scheme to defraud people of money via telemarketing. Borden resided in Montreal, Quebec, Canada, and conducted his telemarketing businesses from there, employing or contracting with other telemarketers and support personnel there and in India. The Defendant and others working for and with him and acting in furtherance of the scheme to defraud obtained lead lists and: contacted people all over the United States by telephone calls in interstate and foreign commerce; offered services and/or products that were not intended to be provided and were not provided, or misrepresented the utility and value of such services and/or products; and obtained preauthorized draft checks that did not require the account holders' signatures and were either deposited into bank accounts of the Defendant's telemarketing companies or went through Intercheck Technologies (ICT), a third party payment processing company based in Columbus, Ohio, which wire transferred the funds, less processing fees, to the Defendant's telemarketing companies. The Defendant and others working for and with him and acting in furtherance of the scheme to defraud also obtained "full data lead lists" containing individual names, addresses, and telephone numbers, with bank names, bank routing numbers, and bank account numbers, and then engaged in conduct known as "slamming the lists," in that they used the listed information and a verification call from a prior telemarketing transaction to have money transferred from the accounts of listed persons to accounts of the Defendant, his companies, or ICT on behalf of the Defendant, without ever talking to, seeking, or obtaining an order or other authorization from

the account holder. Because these lead lists were sold and used by multiple companies, account holders or their guardians sometimes became aware of the fraudulent activity and had the accounts closed or the transactions stopped.

In about March of 2005, Borden caused to be opened merchant processing accounts with Intercheck Technologies (ICT) in the names of Med Tech and Premium Benefits, companies from which he obtained fraudulent telemarketing orders and processed them for payment. Callers for Med Tech and National Fulfillment Center claimed to be selling medical or health care discount cards which were represented to afford discounts for medical care and prescribed pharmaceuticals. Callers for Premium Benefits claimed to be selling an identity theft protection program, that really was comprised only of information about how to find out whether one was an identity theft victim and how to prevent that. Callers targeted elderly people, over 55 years old. During the period of March of 2005 through February of 2006, ICT processed 6,247 deposit transactions in the form of bank drafts for Med Tech. The deposits generally were for about $399 each, but 5,016 of the transactions (about 80%) were returned for insufficient funds, because the account had been closed, or because the transfer had not been authorized. From the remaining 1231 transactions, however, Med Tech and the Defendant realized approximately $491,000. During this same time period, ICT processed 10,008 deposit transactions for Premium Benefits, also in the form of bank drafts. Of these deposits, 7,658 (or about 76%) of the transfers were returned. As a result of the remaining 2350 transactions, Premium Benefits and the Defendant realized approximately $151,000, most of which was transferred by wire from Ohio to a Citizens Bank account in Albany, New York, in the name of Borden National Merchant Services, a company owned by Borden.

In about January of 2007, Borden opened an account at HSBC Bank in Plattsburgh, New York, with himself and National Fulfillment Center as account holders. The account remained dormant until about June of 2007, when it began receiving many deposits from banks throughout the United States, including California, Mississippi, and Maryland, via interstate wire communications of funds, generally in the amount of about $400. In about September of 2007, large numbers of these transactions began to be returned, generally for insufficient funds, because the accounts had been closed, or because the checks were found to be counterfeit. About 200 deposits were returned, in a total amount of approximately $75,000. Inquiries into the returned deposits revealed that account holders generally were elderly (well over 55 years old), infirm, or both. When HSBC froze the account, Borden telephoned from Canada to inquire and explained that: National Fulfillment was engaged in selling healthcare discount cards; it used a company in South Carolina to do "phone bursts" (that is, to make phone calls with recorded sales messages), which were then routed, if the customer was interested, to India, where sales representatives took their order information; and that the company also used a website to recruit customers.

On October 3, 2007, Borden traveled to the HSBC office in Plattsburgh, and repeated that he used "phone bursts" and the website to sell healthcare discount cards. Borden said he had purchased the cards from Pinnacle Choice at a discount, but eventually admitted that he had no arrangement with Pinnacle Choice (a New Jersey company). Borden further admitted that people who had paid for discount cards had not received anything for their money.

On or about September 5, 2007, for the purpose of executing his scheme to defraud, Borden caused to be transmitted in foreign commerce a wire communication, namely the transmission of

4

$500 from his account in HSBC Bank, Plattsburgh, New York, in the name of the National Fulfillment Center, to an account in Montreal, Quebec, Canada.

### III. PRESENTENCE INVESTIGATION REPORT

The offense conduct and Sentencing Guidelines calculations set forth in the Presentence Investigation Report accord with the stipulations and factual basis for the Defendant's guilty plea spelled out in the plea agreement. The total offense level is 28 and the Defendant's criminal history category is I, so his Guideline imprisonment range is 78 - 97 months. The total offense level is calculated as follows:

1. The Defendant's base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1);

2. The Defendant is accountable for a loss of more than $400,000, but less than $1,000,000, increasing the Defendant's offense level by 14, pursuant to U.S.S.G. § 2B1.1(b)(1)(H);

3. The Defendant's offense involved 250 or more victims, increasing the Defendant's offense level by 6, pursuant to U.S.S.G. § 2B1.1(b)(2)(C);

4. The Defendant committed a substantial part of the fraudulent scheme from outside the United States, increasing the Defendant's offense level by 2, pursuant to U.S.S.G. § 2B1.1(b)(9);

5. The Defendant knew that a victim of the offense was a vulnerable victim, increasing the Defendant's offense level by 2, pursuant to U.S.S.G. § 3A1.1(b)(1); and

6. The Defendant has accepted responsibility for his offense and timely notified authorities of his intention to plead guilty, thereby permitting the government to avoid preparing for trial and permitting efficient resource allocationthe government and the Court to allocate their

resources efficiently, warranting reduction of the Defendant's offense level by a total of 3, pursuant to U.S.S.G. § 3E1.1.

IV.   **MOTIONS AND REQUESTS OF THE UNITED STATES**

    A.   **Motion for Additional Reduction for Acceptance of Responsibility**

As suggested above, pursuant to U.S.S.G. § 3E1.1(b), the United States moves for the third offense level reduction for "acceptance of responsibility," because the Defendant timely notified authorities of his intention to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. Subtraction of the third level for acceptance of responsibility yields the total offense level of 28, as spelled out in the Pre-sentence Investigation Report.

    B.   **Motion for a Downward Departure Based Upon Substantial Assistance**

Borden met with Special Agents of the Bureau of Immigration and Customs Enforcement (ICE) from Buffalo, Albany, and Rouse's Point, as well as Royal Canadian Mounted Police (RCMP) and the ICE attache in Canada. Borden provided apparently truthful information, including the names of two co-conspirators and identification documents for both of them, plus information regarding other telemarketing scams, including identifying two perpetrators and providing victim information and information regarding two accounts in the United States. Borden offered to provide active assistance, and several meetings were conducted to bring that about, but issues associated with the assistance and criminal activity to be investigated occurring in Canada prevented the sort of operation that was contemplated. Borden failed to arrange anything active in the United States.

The most generous relative valuation of the assistance provided is 2 levels. Accordingly, pursuant to U.S.S.G. § 5K1.1, the United States moves for a downward departure of 2 levels, to level 26 and an imprisonment range of 63 - 78 months.

### C. *Ex Parte* Communications With The Court

The United States respectfully requests copies of any *ex parte* communications received by the Court in connection with sentencing.

### D. Payment of Financial Obligations

The United States respectfully requests that the Court order immediate payment, in full, of the special assessment, the restitution, any fine imposed, and the costs of prosecution. There are funds available to pay the Defendant's financial obligations, including the $295,000 in cash bail and over $69,000 in two accounts at HSBC Bank in New York.

### E. Notice of Possible Departure

If the Court is considering a departure from the Sentencing Guidelines range other than for substantial assistance, the United States respectfully requests notice and an opportunity to respond. *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

## V. UNITED STATES' SENTENCING RECOMMENDATION

The United States respectfully contends that a sentence within the imprisonment range of 63 - 78 months would be "sufficient, but not greater than necessary," to fulfill the sentencing purposes in 18 U.S.C. § 3553(a)(2), reflecting the seriousness of the offense, the need for deterrence, and just punishment. The Defendant targeted and victimized elderly people, causing significant administrative and financial problems for people on small, fixed incomes. The stress, upset, and

demoralization wrought by the Defendant's crimes adversely affected the health of the victims. Representatives of victims urge "prison time of not less than 15 years" and "throw the book at him – this crime should get the same charge as murder – it ruins lives for-ever."

## VII.    REMAND

Pursuant to the provisions of 18 U.S.C. § 3143(b), the United States respectfully moves the Court for an order directing remand of the Defendant immediately after sentence. The Defendant has long been aware of his impending sentencing, he faces a significant term of imprisonment, and there is no substantial question of law or fact likely to form a viable basis for an appeal. The Defendant waived his right to appeal or collaterally attack his conviction and any sentence of imprisonment of 97 months or less.

## VIII.    CONCLUSION

The United States respectfully recommends a sentence of imprisonment within the range of 63 - 78 months, to be followed by supervised release for 5 years, plus restitution and the $100 special assessment. If the restitution amount does not account for all the proceeds of the crime, the United States recommends a fine.

Dated: November 19, 2009                              Respectfully submitted,

                                                        ANDREW T. BAXTER
                                                      United States Attorney

By:    /s/ *Grant C. Jaquith*
      Grant C. Jaquith
      Assistant U. S. Attorney
      Chief, Criminal Division
      Bar Roll No. 501396

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.

Joel Borden,

            Defendant.

Case No. 08-CR-196 (LEK)

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2009 I electronically filed the Sentencing Memorandum of the United States with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to all parties associated with this case on the CM/ECF system.

ANDREW T. BAXTER
UNITED STATES ATTORNEY

By:   *s/Grant C. Jaquith*

Grant C. Jaquith
Assistant U.S. Attorney
Chief, Criminal Division
Bar Roll No. 501396